Slip Op. 12-118

UNITED STATES COURT OF INTERNATIONAL TRADE

---

CIBA VISION CORPORATION,          :

                   *Plaintiff*,   :

          v.                       :          Court No. 02-00672

UNITED STATES,                    :

              *Defendant*.   :

---

[Cross-motions for summary judgment denied]

Dated:  September 19, 2012

John B. Pellegrini, McGuireWoods LLP, of New York, New York, argued for Plaintiff.

Saul Davis, Senior Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, New York, argued for Defendant. With him on the brief were Tony West, Assistant Attorney General, and Barbara S. Williams, Attorney In Charge, International Trade Field Office.  Of counsel on the brief were Edward N. Maurer and Sheryl A. French, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, of New York, New York.

# OPINION

RIDGWAY, Judge:

In this action, Plaintiff CIBA VISION Corporation ("CIBA") challenges the decision of the U.S. Customs Service[1] denying CIBA's protest of Customs' classification of  Nelfilcon polymer solution ("Nelfilcon") – a chemical that CIBA uses in the manufacture of daily disposable soft contact lenses.

---

[1]The U.S. Customs Service – formerly part of the U.S. Department of Treasury – is now part of the U.S. Department of Homeland Security, and is commonly known as U.S. Customs and Border Protection.  See Bull v. United States, 479 F.3d 1365, 1368 n.1 (Fed. Cir. 2007).  The agency is referred to as "Customs" herein.

CIBA contends that Nelfilcon is classifiable as "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms: Polyvinyl alcohols, whether or not containing unhydrolyzed acetate groups," under subheading 3905.30.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"), and is thus dutiable at the rate of 3.2% *ad valorem*.  *See generally* Subheading 3905.30.00, HTSUS;[2] Plaintiff's Memorandum in Support of Its Motion for Summary Judgment ("Pl.'s Brief") at 4, 9-10, 14, 15; Plaintiff's Memorandum in Opposition to Defendant's Cross-Motion for Summary Judgment and in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply Brief") at 1, 4-5, 8.  In contrast, the Government maintains that Nelfilcon is properly classified under subheading 3905.99.80, which covers "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms: Other: Other: Other," dutiable at the rate of 5.3%.  *See generally* Subheading 3905.99.80, HTSUS; Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Brief") at 1, 8, 11-12, 18; Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply Brief") at 1, 9.

Jurisdiction lies under 28 U.S.C. § 1581(a) (1994).[3]  Cross-motions for summary judgment are pending.  As summarized below, however, a genuine dispute of material fact exists as to the

---

[2]All citations to the HTSUS herein are to the 1999 edition.  This action covers 94 entries of Nelfilcon made through the Port of Atlanta during the period 1999 to 2001.  *See* Pl.'s Brief at 1. There were no relevant changes in the tariff provisions here at issue in 2000 or in 2001.  *See* Pl.'s Brief at 2; *see also* Def.'s Brief at 2.

[3]All statutory citations herein (other than citations to the HTSUS) are to the 1994 edition of the United States Code.

meaning of "polyvinyl alcohol" as that term is used in subheading 3905.30.00. The parties' motions

for summary judgment therefore must be denied.[4]

## I. <u>Background</u>

Nelfilcon Polymer Solution ("Nelfilcon") is an aqueous solution of modified polyvinyl

alcohol ("PVA") that is used in the production of CIBA's daily disposable soft contact lenses. *See*

Joint Statement of Material Facts Not in Dispute ("Joint Statement of Material Facts") ¶¶ 16, 23.

The merchandise at issue here was manufactured in Switzerland and imported into the United States

from Germany and Switzerland between 1999 and 2001. *See* Joint Statement of Material Facts ¶¶

1, 22; *see also* Summons at 3-7 (listing 94 entries).  On the commercial invoices and other entry

documents, the merchandise was described as "NELFILCON Polymer Solution" (with or without

additional words and numbers). *See* Joint Statement of Material Facts ¶¶ 1, 6.

Nelfilcon is created through the process of acetalization – a chemical reaction between PVA

and another chemical. *See* Joint Statement of Material Facts ¶¶ 8-10, 21.  The molar percentage of

PVA in the acetalized PVA, *i.e.*, Nelfilcon, is roughly 95%. *See* Complaint ¶ 5; HQ 964854 (March

18, 2002). After the Nelfilcon is imported, CIBA subjects it to further processing, including thawing

and heating (and, in some cases, the addition of pigment), before molding the Nelfilcon into contact

lenses. *See* Joint Statement of Material Facts ¶¶ 12, 26-27.  CIBA does not trade Nelfilcon, and uses

it exclusively in its lens production facilities. *See* Joint Statement of Material Facts ¶ 29.

---

[4]Both parties make a number of arguments that do not directly focus on the meaning of
"polyvinyl alcohol."  As a practical matter, however, the definitional issue overshadows those other
arguments.

With one exception,[5] Customs liquidated all of the entries of Nelfilcon at issue under HTSUS

subheading 3905.99.80, as "Polymers of vinyl acetate or of other vinyl esters, in primary forms;

other vinyl polymers in primary forms: Other: Other: Other," assessing duties at a rate of 5.3% *ad*

*valorem. See* Joint Statement of Material Facts ¶ 2; Subheading 3905.99.80, HTSUS. CIBA timely

protested, arguing that Nelfilcon is properly classifiable under HTSUS subheading 3905.30.00, as

"Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in

primary forms: Polyvinyl alcohols, whether or not containing unhydrolyzed acetate groups," and is

thus dutiable at the rate of 3.2%. *See* Joint Statement of Material Facts ¶ 3; Subheading 3905.30.00,

HTSUS. Customs denied the protests and, in response to CIBA's Application for Further Review,

issued a ruling letter affirming the agency's classification of Nelfilcon in subheading 3905.99.80.

*See* Joint Statement of Material Facts ¶¶ 4, 37; *see also* HQ 964854.

This action followed.

## II. <u>Standard of Review</u>

Customs classification decisions are reviewed *de novo*, through a two-step analysis. *See* 28

U.S.C. § 2640; <u>Faus Group, Inc. v. United States</u>, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009). The

first step of the analysis "addresses the proper meaning of the relevant tariff provisions, which is a

---

[5]Customs liquidated one entry of Nelfilcon, Entry No. 112-9728133-7, under subheading 3905.12.00 (which covers "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms: Polyvinyl acetate: In aqueous dispersion"). *See* Subheading 3905.12.00, HTSUS; Joint Statement of Material Facts ¶ 2. However, the parties agree that Nelfilcon is not polyvinyl acetate and that liquidation of Entry No. 112-9728133-7 under subheading 3905.12.00 was incorrect. *See* Answer ¶ 6; Counterclaim ¶¶ 13-14; Reply to Counterclaim ¶¶ 13-14. Because the Nelfilcon covered by that entry was identical to the rest of the merchandise at issue in this action, the parties' arguments concerning all entries are the same.

question of law.  The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed."  *See id*. (*citing* Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).[6]

As a practical matter, summary judgment is often appropriate in customs classification cases, because, in many cases, "there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."  Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted).  Indeed, the Court of Appeals has hailed summary judgment as a "salutary procedure . . . to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources."  Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd., 731 F.2d 831, 835 (Fed. Cir. 1984).

However, the function of the judge at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Accordingly, "[t]he question is not whether [a party's] proof will ultimately be found convincing or persuasive. . . .  Rather, the question is only whether the parties have proof for their claims . . . such that a trial is needed."  11

---

[6]Pursuant to 28 U.S.C. § 2639(a)(1), Customs' classification decisions enjoy a presumption of correctness.  However, that presumption attaches only to the agency's factual determinations.  The presumption thus has no force or effect at this stage of the proceedings, because summary judgment may be entered only if there is no genuine dispute as to any material fact – and, if there is no such factual dispute, Customs does not need the benefit of any presumption.  *See*, *e.g.*, Universal Electronics, Inc. v. United States, 112 F.3d 488, 492-93 (Fed. Cir. 1997) (explaining that statutory presumption of correctness "carries no force as to questions of law"); Rollerblade, Inc. v. United States, 112 F.3d 481, 483-84 (Fed. Cir. 1997) (stating that presumption of correctness "is irrelevant where there is no factual dispute between the parties"); Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) (noting that, absent factual dispute between the parties, "the presumption of correctness is not relevant").

Moore's Federal Practice § 56.02[1], p. 56-18 (3d ed. 2012) ("Moore's Federal Practice").  As such, a movant is not entitled to summary judgment "merely because the facts the party offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.  This is true even though both parties move for summary judgment." 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 432-33 (3d ed. 1998) ("Wright & Miller"); *see, e.g.*, Structural Indus., Inc. v. United States, 356 F.3d 1366, 1371-72 (Fed. Cir. 2004) (holding that, where parties filed cross-motions for summary judgment, trial court erred in granting government's motion in light of "genuine issues of material fact" concerning "essential character" of goods at issue).  Summary judgment is proper "only when a trial would be superfluous." 11 Moore's Federal Practice § 56.02[1], p. 56-16.

A party moving for summary judgment thus "is held to a stringent standard." 10A Wright & Miller § 2727, p. 457.  In evaluating a summary judgment motion, "any doubt as to the existence of a genuine issue of material fact will be resolved against the movant." *Id*. § 2727, pp. 457-58.  Further, "[b]ecause the burden is on the movant, the evidence . . . always is construed in favor of the party opposing the motion and the opponent is given the benefit of all favorable inferences that can be drawn from it." *Id*. § 2727, p. 459.  Moreover, "facts asserted by the party opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true." *Id*. § 2727, pp. 459-62.

In sum, because the impact of the entry of summary judgment is "rather drastic," summary judgment is to be "cautiously invoked" and used "with a due regard for its purposes." 10A Wright & Miller § 2712, pp. 215-16.  Summary judgment thus is not appropriate where there are "[d]oubts as to the credibility of a movant's affiants or witnesses." *Id*. § 2726, p. 440.  Similarly, summary

judgment is not appropriate where "the evidence presented . . . is subject to conflicting interpretations, or reasonable people might differ as to its significance." *Id*. § 2725, pp. 433-37. Finally, summary judgment is not appropriate "if the existence of material fact issues is uncertain." *Id*. § 2712, p. 210.

As one leading authority sums up the state of the law, summary judgment is reserved exclusively for "clear cases."  10A Wright & Miller § 2725, pp. 428-29.  Based on the record as it currently stands, this is not such a case.

## III.  Analysis

In the case at bar, the parties agree that the merchandise at issue, Nelfilcon, is a polyvinyl alcohol ("PVA") "that has been chemically modified."  *See*, *e.g.*, Joint Statement of Material Facts ¶¶ 8, 16.  The parties also are in accord as to the appropriate classification at the heading level – specifically, HTSUS heading 3905, which covers "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms."  *See* Pl.'s Brief at 8; Def.'s Brief at 11-12; Heading 3905, HTSUS.

Similarly, of the four subheadings at the first level of indentation under heading 3905 (*i.e.*, the so-called "one-dash" or "level one" subheadings), the parties agree that two – specifically, "Polyvinyl acetate" and "Vinyl acetate copolymers" – have no application here.  *See* Joint Statement of Material Facts ¶ 20; Pl.'s Brief at 4; Def.'s Brief at 3.[7]  The parties' dispute thus focuses solely

---

[7]"Polyvinyl acetate" is classified under subheading 3905.12.00 if it is "[i]n aqueous dispersion," and under subheading 3905.19.00 ("Other") if it is not.  *See* Subheading 3905.12.00, HTSUS; Subheading 3905.19.00, HTSUS.  "Vinyl acetate copolymers" are classified under subheading 3905.21.00 if they are "[i]n aqueous dispersion," and under subheading 3905.29.00 ("Other") if they are not.  *See* Subheading 3905.21.00, HTSUS; Subheading 3905.29.00, HTSUS.

on the remaining two competing subheadings under heading 3905 – "Polyvinyl alcohols, whether

or not containing unhydrolyzed acetate groups" (specifically, subheading 3905.30.00) *versus* the

residual (or "basket") subheading, "Other" (specifically, subheading 3905.99.80). *See, e.g.*, Pl.'s

Brief at 2, 7, 8, 15; Def.'s Brief at 1, 2, 8; Subheading 3905.30.00, HTSUS; Subheading 3905.99.80,

HTSUS.[8]  Asserting that Nelfilcon is a form of PVA and is commonly referred to as PVA, CIBA

claims that the proper classification is under subheading 3905.30.00 (the *eo nomine* provision for

PVA),[9] while the Government defends Customs' classification under subheading 3905.99.80 (the

residual, or basket, provision). *See, e.g.*, Pl.'s Brief at 9-10, 11-13; Pl.'s Reply Brief at 2, 6-7; Def.'s

Brief at 5, 20-23; Def.'s Reply Brief at 3-4, 6, 8.

The tariff classification of all merchandise imported into the United States is governed by

the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation

("ARIs"), which provide a framework for classification under the HTSUS, and are to be applied in

numerical order.  *See* BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007); 19

U.S.C. § 1202.[10]  Most merchandise is classified pursuant to GRI 1, which provides for classification

---

[8]As noted above, subheading 3905.30.00 covers "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms: Polyvinyl alcohols, whether or not containing unhydrolyzed acetate groups," and subheading 3905.99.80 covers "Polymers of vinyl acetate or of other vinyl esters, in primary forms; other vinyl polymers in primary forms: Other: Other: Other."

[9]An *eo nomine* tariff provision is one that describes the covered merchandise by name, rather than by use.  *See* BASF Corp. v. United States, 482 F.3d 1324, 1326 n.2 (2007).

[10]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"), the Additional U.S. Rules of Interpretation ("ARIs"), and Sections I to XXII of the HTSUS (including Chapters 1 to 99, together with all section notes and chapter notes, article provisions, and tariff and other treatment accorded thereto), as well as the Chemical Appendix.  *See* BASF Corp., 482 F.3d at 1325-26; Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (noting that

"according to the terms of the headings and any relative section or chapter notes."  *See* GRI 1,

HTSUS.[11]  After the proper heading is determined, GRI 6 governs classification at the subheading

level, and requires a renewed sequential application of GRIs 1 to 5 to the particular subheadings

under consideration.  *See* GRI 6, HTSUS ("For legal purposes, the classification of goods in the

subheadings of a heading shall be determined according to the terms of those subheadings and any

related subheading notes and, *mutatis mutandis*, to the [GRIs], on the understanding that only

subheadings at the same level are comparable.").

      Here, because the proper heading is not in dispute, the analysis begins at the subheading

level, with GRI 1 (which applies through GRI 6).  Thus, the first step is to construe the terms of the

two competing subheadings, together with any pertinent section and chapter notes (which are

statutory law), to determine whether they require a specific classification.  *See* Avenues in Leather,

Inc. v. United States, 423 F.3d 1326, 1333 (Fed. Cir. 2005) (explaining that Section Notes and

Chapter Notes "are not optional interpretive rules, but are statutory law, codified at 19 U.S.C. §

1202") (internal quotation marks omitted); Degussa Corp. v. United States, 508 F.3d 1044, 1047

(Fed. Cir. 2007) (stating that "section and chapter notes are integral parts of the HTSUS, and have

the same legal force as the text of the headings").

      Tariff terms are construed "according to their common commercial meanings"; and a court

---

the HTSUS "is indeed a statute but is not published physically in the United States Code") (*citing* 19 U.S.C. § 1202).  The terms of the HTSUS are "considered 'statutory provisions of law for all purposes.'" *See* Alcan Aluminum Corp. v. United States, 165 F.3d 898, 904 n.5 (Fed. Cir. 1999) (internal citation omitted).

   [11]Only if the headings and Section and Chapter Notes do not determine classification does a classification analysis proceed beyond GRI 1.  *See* Mita Copystar America v. United States, 160 F.3d 710, 712 (Fed. Cir. 1998).

may rely both on its own understanding of a term and on lexicographic and scientific authorities.

*See* <u>Millenium Lumber Distribution Ltd. v. United States</u>, 558 F.3d 1326, 1328-29 (Fed. Cir. 2009);

<u>Len-Ron Mfg. Co. v. United States</u>, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  Also instructive are the

Explanatory Notes to the Harmonized Commodity Description and Coding System ("Explanatory

Notes"), "which – although not controlling – provide interpretive guidance."  *See* <u>E.T. Horn Co. v.</u>

<u>United States</u>, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citation omitted); *see generally* World Customs

Organization, Harmonized Commodity Description and Coding System (2d ed. 1996).[12]

      Because the Government's asserted classification – subheading 3905.99.80 – is a residual,

or "basket," provision, Nelfilcon necessarily can be classified thereunder only if it is not properly

---

      [12]As Congress has recognized, the Explanatory Notes "provide a commentary on the scope of each heading of the Harmonized System and are thus useful in ascertaining the classification of merchandise under the system."  *See* H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582; *see also* Guidance for Interpretation of Harmonized System, 54 Fed. Reg. 35,127, 35,128 (Aug. 23, 1989) (noting that the  Explanatory Notes provide a commentary on the scope of each heading of the HTSUS, and are the official interpretation of the Harmonized System at the international level).

      The Explanatory Notes are the official interpretation of the Harmonized Commodity Description and Coding System (on which the HTSUS is based), as set forth by the World Customs Organization (the same body which drafts the international nomenclature).  *See* <u>Rocknel Fastener, Inc. v. United States</u>, 267 F.3d 1354, 1360 (Fed. Cir. 2001) (explaining that Explanatory Notes are "prepared by the World Customs organization to accompany the international harmonized schedule").  Accordingly, although the Explanatory Notes "do not constitute controlling legislative history," they serve a critical function as an interpretative supplement to the HTSUS, and "are intended to clarify the scope of HTSUS [provisions,] and to offer guidance in interpreting [those provisions]."  *See* <u>Mita Copystar America v. United States</u>, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted).   The Explanatory Notes are thus highly authoritative – "persuasive" and "'generally indicative of the proper interpretation of a tariff provision.'" *See* <u>Agfa Corp. v. United States</u>, 520 F.3d 1326, 1329-30 (Fed. Cir. 2008) (*quoting* <u>Degussa Corp.</u>, 508 F.3d at 1047 (citation omitted)).

      All citations to the Explanatory Notes herein are to the 1996 edition.

classifiable under the parallel but more specific provision, subheading 3905.30.00, as PVA. *See*,

*e.g.*, <u>Russell Stadelman & Co. v. United States</u>, 242 F.3d 1044, 1047 (Fed. Cir. 2001) (explaining

that classification in a residual, or "basket," provision is appropriate only where there is no other

tariff provision that more specifically covers the merchandise).  Pursuant to GRI 1, the touchstone

in analyzing the possibility of classification under subheading 3905.30.00 is the meaning of the term

"polyvinyl alcohol" as it is used in the subheading. *See* GRI 1, HTSUS (providing for classification

"*according to the terms of the headings* and any relative section or chapter notes" (emphasis

added)).  However, neither party has identified any lexicographic or scientific or other authorities

that define "polyvinyl alcohol" ("PVA") in such a way as to permit a determination as to whether

the merchandise at issue falls within the common or commercial meaning of that term.[13]

      Both parties point to Subheading Note 1 to Chapter 39, which provides, in relevant part:

Within any one heading of this chapter [*i.e.*, Chapter 39], polymers (including
copolymers) are to be classified according to the following provisions:

(a)     Where [– as here – ] there is a subheading named "Other" in the same series:

                    *    *    *    *

(3)     Chemically modified polymers are to be classified in the
subheading named "Other", provided that the chemically
modified polymers are not more specifically covered by
another subheading.

Subheading Note 1, Chapter 39, HTSUS (*discussed in* Pl.'s Brief at 7-11; Pl.'s Reply Brief at 2-4;

Def.'s Brief at 10, 12-13, 15-20, 24; Def.'s Reply Brief at 2-3, 5).  The Government highlights the

---

[13]Although the Government refers to two technical dictionaries, neither definitively includes
or excludes Nelfilcon from the definition of "polyvinyl alcohol." *See* Def.'s Brief at 21-23
(*discussing* Hawley's Condensed Chemical Dictionary (14th ed. 2001) and McGraw Hill Dictionary
of Scientific and Technical Terms (3d ed. 1984)).

first part of Subheading Note 1(a)(3), arguing that the effect of the note is to require Nelfilcon's

classification under subheading 3905.99.80, the "Other" provision.  *See*, *e.g.*, Def.'s Brief at 8, 10;

Def.'s Reply Brief at 5.  On the other hand, CIBA underscores the second part of the same note –

that is, the caveat which exempts from classification under the "Other" provision those chemically

modified polymers that are "more specifically covered by another subheading."  *See*, *e.g.*, Pl.'s Brief

at 8-9; Subheading Note 1, Chapter 39, HTSUS.  Asserting that Nelfilcon is "specifically provided

for in the subheading for PVA [*i.e.*, subheading 3905.30.00]," CIBA contends that "Subheading

Note 1 precludes classification in [subheading 3905.99.80,] the subheading named 'Other.'" *Id.*; *see*

*also* Subheading Note 1, Chapter 39, HTSUS.  The text of Subheading Note 1(a)(3) thus contributes

little or nothing to the resolution of the parties' dispute.

      The relevant Explanatory Note states:

(A)    Classification when there is a subheading named "Other" in the same series

*   *   *   *

(3)    Subparagraph (a)(3) of Subheading Note 1 deals with the classification of chemically modified polymers.  These polymers are to be classified in the subheading named "Other", provided that the chemically modified polymers are not more specifically covered by another subheading.  The consequence of this Note is that chemically modified polymers are not classified in the same subheading as unmodified polymer[s], unless the unmodified polymer itself is classifiable in a subheading named "Other".

Thus, for example, chlorinated or chlorosulphonated polyethylene, being chemically modified polyethylene of heading 39.01, should be classified in subheading 3901.90 ("Other").

On the other hand, polyvinyl alcohol, which is obtained by the hydrolysis of polyvinyl acetate,

> should be classified in subheading 3905.30 which
> specifically covers it.

Subheading Explanatory Note, Subheading 1, Chapter 39, HTSUS (*discussed in* Pl.'s Brief at 7-8).[14]

To the extent that the Explanatory Note refers to "polyvinyl alcohol, which is obtained by the

hydrolysis of polyvinyl acetate," it may be read to suggest some sort of definition of PVA.  *See*

Subheading Explanatory Note, Subheading 1, Chapter 39, HTSUS.  But, on the existing record, it

will not suffice to support summary judgment.  *See* 10A Wright & Miller § 2712, p. 210 (stating that

summary judgment is not appropriate "if the existence of material fact issues is uncertain"); *id.* §

2725, pp. 428-29 (explaining that summary judgment is reserved for "clear cases").

      In lieu of defining "polyvinyl alcohol" (as the term is used in subheading 3905.30.00) via

one of the more conventional sources, such as a scientific or technical dictionary, CIBA instead

invokes "[the] basic rule of tariff interpretation that in the absence of a contrary legislative intent[,]

an *eo nomine* provision, one which describes a commodity by a specific name, usually well-known

in commerce, includes all forms of the article," and argues broadly that Nelfilcon has a commercial

identity as PVA.  Pl.'s Brief at 11; *see also id.* at 11-13; Pl.'s Reply Brief at 6 (asserting that "[t]he

keystone issue in this proceeding is whether the subject merchandise is commonly known as

PVA").[15]

───────────────

[14]In its briefs, the Government inexplicably relies on the 1987 edition of the Explanatory
Notes, rather than those in force at the time of the entries at issue.  Moreover, the Government's
briefs failed even to identify the edition that it was using.  These actions seriously and needlessly
complicated the review of the parties' pending motions.

[15]Although the point is not free from doubt, it does not appear that CIBA is claiming that the
term "polyvinyl alcohol" as used in subheading 3905.30.00 is a "commercial designation" – a usage
that is "'definite, uniform, and general throughout the trade,'" and which deviates from the common
or dictionary definition of the term.  *See, e.g.,* Russell Stadelman & Co., 242 F.3d at 1048-49

In particular, CIBA contends that Nelfilcon "is commonly referred to as PVA in a variety of reliable sources."  Pl.'s Brief at 11.[16]  For example, CIBA notes that the company refers to Nelfilcon as PVA in regulatory filings that the company submits to the U.S. Food and Drug Administration.  *See id.*; Joint Statement of Material Facts ¶ 34 & Exh. N.  Similarly, CIBA notes that Nelfilcon "is described as PVA in various journals."  *See* Pl.'s Brief at 11-12; Joint Statement of Material Facts ¶ 33 & Exhs. K, L, M.  CIBA emphasizes that, in the HQ ruling letter, Customs itself referred to Nelfilcon as PVA.  *See* Pl.'s Brief at 12; Joint Statement of Material Facts ¶ 37; HQ 964854.  In addition, CIBA states that "[t]he United States Adopted Name Council of the American Medical Association has accepted the name 'Nelfilcon A,' which it describes as 'polymer of poly(vinyl alcohol) partially acetalized . . . .'"  *See* Pl.'s Brief at 12; Joint Statement of Material Facts ¶ 30 & Exh. J.  CIBA also relies on the U.S. Department of Commerce's Order in the

_____

(*quoting* Rohm & Haas Co. v. United States, 727 F.2d 1095, 1097 (Fed. Cir. 1984)).

    [16]CIBA amply lards its briefs with not-so-subtle references seeking to equate Nelfilcon and PVA.  *See*, *e.g.*, Pl.'s Brief at 4 (stating that subject merchandise "is commonly referred to as PVA" and "is a form of PVA, albeit an improved form"); *id.* at 9 (asserting that subject merchandise "is an improved version of PVA" and "commonly is known as PVA"); *id.* (stating that subject merchandise "is commonly referred to as PVA" and "is a form of PVA"); *id.* at 10 (arguing that subject merchandise is "a version of PVA"); *id.* at 11 (asserting that "the parties in this proceeding agree that the subject merchandise is a form of PVA"); *id.* (stating that subject merchandise "is commonly referred to as PVA in a variety of reliable sources"); *id.* at 12 (arguing that subject merchandise is "within the common meaning of the term PVA"); *id.* at 13 (asserting that subject merchandise "is essentially PVA"); Pl.'s Reply Brief at 2 (stating that subject merchandise "is a form of poly (vinyl alcohol) ('PVA')"); *id.* (asserting that subject merchandise "is known as a form of PVA"); *id.* at 4 (alleging that parties have "[an] agreement that the subject merchandise is a form of PVA"); *id.* at 6 (stating that "the Government does not dispute plaintiff's assertions [that the subject merchandise is commonly known as PVA] . . . and apparently concedes that Nelfilcon is known as a form of PVA"); *id.* at 7 (asserting that "Nelfilcon is referred to as a form of PVA" and "the Government does not dispute this characterization"); *id.* (stating that subject merchandise "is referred to as a form of PVA").

antidumping proceeding involving PVA from the People's Republic of China.  *See* Pl.'s Brief at 12-13; Joint Statement of Material Facts ¶ 36 & Exh. P (Antidumping Duty Order: Polyvinyl Alcohol from the People's Republic of China, 68 Fed. Reg. 56,620 (Oct. 1, 2003) ("Antidumping Duty Order")).  CIBA notes that the Antidumping Duty Order "lists 15 types or versions of PVA as being excluded" from the scope of the Order, and emphasizes that "[t]he Order also states that the merchandise under investigation is classified under subheading 3905.30.00," the provision that CIBA claims here.  *See* Pl.'s Brief at 12; Antidumping Duty Order, 68 Fed. Reg. at 56,620-21. CIBA concedes (as it must) that the Antidumping Duty Order "is not binding as to classification," but nevertheless maintains that the Order "substantiates that there are a wide variety of substances commonly and commercially referred to as PVA."  *See* Pl.'s Brief at 12-13.

However, CIBA significantly overstates the case in claiming that the various materials that it lists (outlined above) "establish that [Nelfilcon] is referred to as PVA."  Pl.'s Brief at 13.  Any agreement to that effect is conspicuously absent from the parties' Joint Statement of Material Facts. *See* Joint Statement of Material Facts, *passim*.  Indeed, the Government vigorously protests CIBA's attempts to rely on the parties' Joint Statement of Material Facts and certain exhibits to that document to claim that Nelfilcon is a form of PVA.  *See*, *e.g.*, Def.'s Brief at 20-23 (arguing, *inter alia*, that "Nelfilcon is in fact not PVA or a form of PVA," nor is it "encompassed by the provisions for PVAs"); *id.* at 26 (asserting that "while Nelfilcon is a chemically modified PVA, and a two-stage derivative of PVA, it is not PVA, or any form of PVA"); Def.'s Reply Brief at 7-8 (same).  The Government emphasizes, for example, that "[t]he joint statement [of material facts] includes no 'fact' that [Nelfilcon] is 'commonly known as PVA,' and [the Government] do[es] not believe such a conclusion can be drawn from the documents included with the joint statement."  *Id.* at 8.  So as

to leave no room for doubt, the Government concludes its reply brief by expressly, emphatically, and "unequivocally" reiterating its position that "Nelfilcon is *not* PVA nor a form of PVA."  *Id*.

CIBA's reliance on the materials listed above and the many references in its briefs seeking to equate Nelfilcon and PVA cannot suffice to establish the point as a statement of undisputed material fact.  Under these circumstances, CIBA cannot prevail on its Motion for Summary Judgment.  But, at the same time, the failure to define "polyvinyl alcohol" also makes it difficult, if not impossible, to conclude that Nelfilcon cannot be classified under subheading 3905.30.00.  And, absent a determination that Nelfilcon *is not* classifiable as polyvinyl alcohol under subheading 3905.30.00, it is not possible to conclude that Nelfilcon *is* properly classifiable under the residual, "basket" provision – specifically, subheading 3905.99.80, "Other" – as the Government claims.  The Government's Cross-Motion for Summary Judgment therefore must also fail.

## IV.  Conclusion

As set forth above, CIBA has not defined "polyvinyl alcohol" as that term is used in subheading 3905.30.00 of the HTSUS, much less established that Nelfilcon falls within the meaning of the term.  CIBA's Motion for Summary Judgment must therefore be denied.  By the same token, absent a definition of "polyvinyl alcohol," it cannot be concluded on the existing record that Nelfilcon cannot be classified as "polyvinyl alcohol" under subheading 3905.30.00.  And because classification as "polyvinyl alcohol" under the more specific provision, subheading 3905.30.00, cannot be ruled out, it is not possible to conclude that classification under the residual, "basket" provision, subheading 3905.99.80, is proper.  The Government's Cross-Motion for Summary Judgment therefore must also be denied.

An order will enter accordingly.

                                        _____/s/ Delissa A. Ridgway_____
                                                  Delissa A. Ridgway
                                                        Judge

Dated:  September 19, 2012
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

CIBA VISION CORPORATION,                    :

                                            :

                    *Plaintiff*,            :

                                            :        Court No. 02-00672
          v.                                :

                                            :
UNITED STATES,                              :

                                            :
                    *Defendant*.            :
_____

## **ORDER**

This action having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

NOW, therefore, in conformity with said decision, it is

ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, denied; and it is further

ORDERED that Defendant's Cross-Motion for Summary Judgment be, and hereby is, denied.


                                        _____
                                            /s/ Delissa A. Ridgway
                                        Delissa A. Ridgway, Judge


Dated:  September 19, 2012
        New York, New York